Justice THOMAS, dissenting.
I join Justice ALITO's dissent. As Justice ALITO explains, the Court's decision today is irreconcilable with strict scrutiny, rests on pernicious assumptions about race, and departs from many of our precedents.
I write separately to reaffirm that "a State's use of race in higher education admissions decisions is categorically prohibited by the Equal Protection Clause." Fisher v. University of Tex. at Austin, 570 U.S. ----, ----, 133 S.Ct. 2411, 2422, 186 L.Ed.2d 474 (2013) (THOMAS, J., concurring). "The Constitution abhors classifications based on race because every time the government places citizens on racial registers and makes race relevant to the provision of burdens or benefits, it demeans us all." Id., at ----, 133 S.Ct., at 2422 (internal quotation marks omitted). That constitutional imperative does not change in the face of a "faddish theor[y]" that racial discrimination may produce "educational benefits." Id., at ----, ----, 133 S.Ct., at 2421, 2428. The Court was wrong to hold otherwise in Grutter v. Bollinger, 539 U.S. 306, 343, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003). I would overrule Grutter and reverse the Fifth Circuit's judgment.
Justice ALITO, with whom THE CHIEF JUSTICE and Justice THOMAS join, dissenting.
Something strange has happened since our prior decision in this case. See Fisher v. University of Tex. at Austin, 570 U.S. ----, 133 S.Ct. 2411, 186 L.Ed.2d 474 (2013) (Fisher I ). In that decision, we held that strict scrutiny requires the University of Texas at Austin (UT or University) to show that its use of race and ethnicity in making admissions decisions serves compelling interests and that its plan is narrowly tailored to achieve those ends. Rejecting the argument that we should defer to UT's judgment on those matters, we made it clear that UT was obligated (1) to identify the interests justifying its plan with enough specificity to permit a reviewing court to determine whether the requirements of strict scrutiny were met, and (2) to show that those requirements were in fact satisfied. On remand, UT failed to do what our prior decision demanded. The University has still not identified with any degree of specificity the interests that its use of race and ethnicity is supposed to serve. Its primary argument is that merely invoking "the educational benefits of diversity" is sufficient and that it need not identify any metric that would allow a court to determine whether its plan is needed to serve, or is actually serving, those interests. This is nothing less than the plea for deference that we emphatically rejected in our prior decision. Today, however, the Court inexplicably grants that request.
To the extent that UT has ever moved beyond a plea for deference and identified the relevant interests in more specific terms, its efforts have been shifting, unpersuasive, and, at times, less than candid.
*2216 When it adopted its race-based plan, UT said that the plan was needed to promote classroom diversity. See Supp. App. 1a, 24a-25a, 39a; App. 316a. It pointed to a study showing that African-American, Hispanic, and Asian-American students were underrepresented in many classes. See Supp. App. 26a. But UT has never shown that its race-conscious plan actually ameliorates this situation. The University presents no evidence that its admissions officers, in administering the "holistic" component of its plan, make any effort to determine whether an African-American, Hispanic, or Asian-American student is likely to enroll in classes in which minority students are underrepresented. And although UT's records should permit it to determine without much difficulty whether holistic admittees are any more likely than students admitted through the Top Ten Percent Law, Tex. Educ.Code Ann. § 51.803 (West Cum. Supp. 2015), to enroll in the classes lacking racial or ethnic diversity, UT either has not crunched those numbers or has not revealed what they show. Nor has UT explained why the underrepresentation of Asian-American students in many classes justifies its plan, which discriminates against those students.
At times, UT has claimed that its plan is needed to achieve a "critical mass" of African-American and Hispanic students, but it has never explained what this term means. According to UT, a critical mass is neither some absolute number of African-American or Hispanic students nor the percentage of African-Americans or Hispanics in the general population of the State. The term remains undefined, but UT tells us that it will let the courts know when the desired end has been achieved. See App. 314a-315a. This is a plea for deference-indeed, for blind deference-the very thing that the Court rejected in Fisher I.
UT has also claimed at times that the race-based component of its plan is needed because the Top Ten Percent Plan admits the wrong kind of African-American and Hispanic students, namely, students from poor families who attend schools in which the student body is predominantly African-American or Hispanic. As UT put it in its brief in Fisher I, the race-based component of its admissions plan is needed to admit "[t]he African-American or Hispanic child of successful professionals in Dallas." Brief for Respondents, O.T. 2012, No. 11-345, p. 34.
After making this argument in its first trip to this Court, UT apparently had second thoughts, and in the latest round of briefing UT has attempted to disavow ever having made the argument. See Brief for Respondents 2 ("Petitioner's argument that UT's interest is favoring 'affluent' minorities is a fabrication"); see also id., at 15. But it did, and the argument turns affirmative action on its head. Affirmative-action programs were created to help disadvantaged students.
Although UT now disowns the argument that the Top Ten Percent Plan results in the admission of the wrong kind of African-American and Hispanic students, the Fifth Circuit majority bought a version of that claim. As the panel majority put it, the Top Ten African-American and Hispanic admittees cannot match the holistic African-American and Hispanic admittees when it comes to "records of personal achievement," a "variety of perspectives" and "life experiences," and "unique skills." 758 F.3d 633, 653 (2014). All in all, according to the panel majority, the Top Ten Percent students cannot "enrich the diversity of the student body" in the same way as the holistic admittees. Id., at 654. As Judge Garza put it in dissent, the panel majority concluded that the Top Ten Percent *2217 admittees are "somehow more homogenous, less dynamic, and more undesirably stereotypical than those admitted under holistic review." Id., at 669-670 (Garza, J., dissenting).
The Fifth Circuit reached this conclusion with little direct evidence regarding the characteristics of the Top Ten Percent and holistic admittees. Instead, the assumption behind the Fifth Circuit's reasoning is that most of the African-American and Hispanic students admitted under the race-neutral component of UT's plan were able to rank in the top decile of their high school classes only because they did not have to compete against white and Asian-American students. This insulting stereotype is not supported by the record. African-American and Hispanic students admitted under the Top Ten Percent Plan receive higher college grades than the African-American and Hispanic students admitted under the race-conscious program. See Supp. App. 164a-165a.
It should not have been necessary for us to grant review a second time in this case, and I have no greater desire than the majority to see the case drag on. But that need not happen. When UT decided to adopt its race-conscious plan, it had every reason to know that its plan would have to satisfy strict scrutiny and that this meant that it would be its burden to show that the plan was narrowly tailored to serve compelling interests. UT has failed to make that showing. By all rights, judgment should be entered in favor of petitioner.
But if the majority is determined to give UT yet another chance, we should reverse and send this case back to the District Court. What the majority has now done-awarding a victory to UT in an opinion that fails to address the important issues in the case-is simply wrong.
I
Over the past 20 years, UT has frequently modified its admissions policies, and it has generally employed race and ethnicity in the most aggressive manner permitted under controlling precedent.
Before 1997, race was considered directly as part of the general admissions process, and it was frequently a controlling factor. Admissions were based on two criteria: (1) the applicant's Academic Index (AI), which was computed from standardized test scores and high school class rank, and (2) the applicant's race. In 1996, the last year this race-conscious system was in place, 4.1% of enrolled freshmen were African-American, 14.7% were Asian-American, and 14.5% were Hispanic. Supp. App. 43a.
The Fifth Circuit's decision in Hopwood v. Texas, 78 F.3d 932 (1996), prohibited UT from using race in admissions. In response to Hopwood, beginning with the 1997 admissions cycle, UT instituted a "holistic review" process in which it considered an applicant's AI as well as a Personal Achievement Index (PAI) that was intended, among other things, to increase minority enrollment. The race-neutral PAI was a composite of scores from two essays and a personal achievement score, which in turn was based on a holistic review of an applicant's leadership qualities, extracurricular activities, honors and awards, work experience, community service, and special circumstances. Special consideration was given to applicants from poor families, applicants from homes in which a language other than English was customarily spoken, and applicants from single-parent households. Because this race-neutral plan gave a preference to disadvantaged students, it had the effect of "disproportionately" benefiting minority candidates. 645 F.Supp.2d 587, 592 (W.D.Tex.2009).
*2218 The Texas Legislature also responded to Hopwood. In 1997, it enacted the Top Ten Percent Plan, which mandated that UT admit all Texas seniors who rank in the top 10% of their high school classes. This facially race-neutral law served to equalize competition between students who live in relatively affluent areas with superior schools and students in poorer areas served by schools offering fewer opportunities for academic excellence. And by benefiting the students in the latter group, this plan, like the race-neutral holistic plan already adopted by UT, tended to benefit African-American and Hispanic students, who are often trapped in inferior public schools. 758 F.3d, at 650-653.
Starting in 1998, when the Top Ten Percent Plan took effect, UT's holistic, race-neutral AI/PAI system continued to be used to fill the seats in the entering class that were not taken by Top Ten Percent students. The AI/PAI system was also used to determine program placement for all incoming students, including the Top Ten Percent students.
"The University's revised admissions process, coupled with the operation of the Top Ten Percent Law, resulted in a more racially diverse environment at the University." Fisher I, 570 U.S., at ----, 133 S.Ct., at 2416. In 2000, UT announced that its "enrollment levels for African American and Hispanic freshmen have returned to those of 1996, the year before the Hopwood decision prohibited the consideration of race in admissions policies." App. 393a; see also Supp. App. 23a-24a (pre-Hopwood diversity levels were "restored" in 1999); App. 392a-393a ("The 'Top 10 Percent Law' is Working for Texas" and "has enabled us to diversify enrollment at UT Austin with talented students who succeed"). And in 2003, UT proclaimed that it had "effectively compensated for the loss of affirmative action." Id., at 396a; see also id., at 398a ("Diversity efforts at The University of Texas at Austin have brought a higher number of freshman minority students-African Americans, Hispanics and Asian-Americans-to the campus than were enrolled in 1996, the year a court ruling ended the use of affirmative action in the university's enrollment process"). By 2004-the last year under the holistic, race-neutral AI/PAI system-UT's entering class was 4.5% African-American, 17.9% Asian-American, and 16.9% Hispanic. Supp. App. 156a. The 2004 entering class thus had a higher percentage of African-Americans, Asian-Americans, and Hispanics than the class that entered in 1996, when UT had last employed racial preferences.
Notwithstanding these lauded results, UT leapt at the opportunity to reinsert race into the process. On June 23, 2003, this Court decided Grutter v. Bollinger, 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003), which upheld the University of Michigan Law School's race-conscious admissions system. In Grutter, the Court warned that a university contemplating the consideration of race as part of its admissions process must engage in "serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks." Id., at 339, 123 S.Ct. 2325. Nevertheless, on the very day Grutter was handed down, UT's president announced that "[t]he University of Texas at Austin will modify its admissions procedures" in light of Grutter, including by "implementing procedures at the undergraduate level that combine the benefits of the Top 10 Percent Law with affirmative action programs." App. 406a-407a (emphasis added).[1] UT purports to *2219 have later engaged in "almost a year of deliberations," id., at 482a, but there is no evidence that the reintroduction of race into the admissions process was anything other than a foregone conclusion following the president's announcement.
"The University's plan to resume race-conscious admissions was given formal expression in June 2004 in an internal document entitled Proposal to Consider Race and Ethnicity in Admissions" (Proposal). Fisher I, supra, at ----, 133 S.Ct., at 2416. The Proposal stated that UT needed race-conscious admissions because it had not yet achieved a "critical mass of racial diversity." Supp. App. 25a. In support of this claim, UT cited two pieces of evidence. First, it noted that there were "significant differences between the racial and ethnic makeup of the University's undergraduate population and the state's population." Id., at 24a. Second, the Proposal "relied in substantial part," Fisher I, supra, at ----, 133 S.Ct., at 2416, on a study of a subset of undergraduate classes containing at least five students, see Supp. App. 26a. The study showed that among select classes with five or more students, 52% had no African-Americans, 16% had no Asian-Americans, and 12% had no Hispanics. Ibid. Moreover, the study showed, only 21% of these classes had two or more African-Americans, 67% had two or more Asian-Americans, and 70% had two or more Hispanics. See ibid. Based on this study, the Proposal concluded that UT "has not reached a critical mass at the classroom level." Id., at 24a. The Proposal did not analyze the backgrounds, life experiences, leadership qualities, awards, extracurricular activities, community service, personal attributes, or other characteristics of the minority students who were already being admitted to UT under the holistic, race-neutral process.
"To implement the Proposal the University included a student's race as a component of the PAI score, beginning with applicants in the fall of 2004." Fisher I, 570 U.S., at ----, 133 S.Ct., at 2416. "The University asks students to classify themselves from among five predefined racial categories on the application." Ibid. "Race is not assigned an explicit numerical value, but it is undisputed that race is a meaningful factor." Ibid. UT decided to use racial preferences to benefit African-American and Hispanic students because it considers those groups "underrepresented minorities." Supp. App. 25a; see also App. 445a-446a (defining "underrepresented minorities" as "Hispanic[s] and African Americans"). Even though UT's classroom study showed that more classes lacked Asian-American students than lacked Hispanic students, Supp. App. 26a, UT deemed Asian-Americans "overrepresented " based on state demographics, *2220 645 F.Supp.2d, at 606 ; see also ibid. ("It is undisputed that UT considers African-Americans and Hispanics to be underrepresented but does not consider Asian-Americans to be underrepresented").
Although UT claims that race is but a "factor of a factor of a factor of a factor," id., at 608, UT acknowledges that "race is the only one of [its] holistic factors that appears on the cover of every application," Tr. of Oral Arg. 54 (Oct. 10, 2012). "Because an applicant's race is identified at the front of the admissions file, reviewers are aware of it throughout the evaluation." 645 F.Supp.2d, at 597 ; see also id., at 598 ("[A] candidate's race is known throughout the application process"). Consideration of race therefore pervades every aspect of UT's admissions process. See App. 219a ("We are certainly aware of the applicant's race. It's on the front page of the application that's being read [and] is used in context with everything else that's part of the applicant's file"). This is by design, as UT considers its use of racial classifications to be a benign form of "social engineering." Powers, Why Schools Still Need Affirmative Action, National L. J., Aug. 4, 2014, p. 22 (editorial by Bill Powers, President of UT from 2006-2015) ("Opponents accuse defenders of race-conscious admissions of being in favor of 'social engineering,' to which I believe we should reply, 'Guilty as charged' ").
Notwithstanding the omnipresence of racial classifications, UT claims that it keeps no record of how those classifications affect its process. "The university doesn't keep any statistics on how many students are affected by the consideration of race in admissions decisions," and it "does not know how many minority students are affected in a positive manner by the consideration of race." App. 337a. According to UT, it has no way of making these determinations. See id., at 320a-322a. UT says that it does not tell its admissions officers how much weight to give to race. See Deposition of Gary Lavergne 43-45, Record in No. 1:08-CV-00263 (WD Tex.), Doc. 94-9 (Lavergne Deposition). And because the influence of race is always "contextual," UT claims, it cannot provide even a single example of an instance in which race impacted a student's odds of admission. See App. 220a ("Q. Could you give me an example where race would have some impact on an applicant's personal achievement score? A. To be honest, not really.... [I]t's impossible to say-to give you an example of a particular student because it's all contextual"). Accordingly, UT asserts that it has no idea which students were admitted as a result of its race-conscious system and which students would have been admitted under a race-neutral process. UT thus makes no effort to assess how the individual characteristics of students admitted as the result of racial preferences differ (or do not differ) from those of students who would have been admitted without them.
II
UT's race-conscious admissions program cannot satisfy strict scrutiny. UT says that the program furthers its interest in the educational benefits of diversity, but it has failed to define that interest with any clarity or to demonstrate that its program is narrowly tailored to achieve that or any other particular interest. By accepting UT's rationales as sufficient to meet its burden, the majority licenses UT's perverse assumptions about different groups of minority students-the precise assumptions strict scrutiny is supposed to stamp out.
A
"The moral imperative of racial neutrality is the driving force of the Equal Protection *2221 Clause." Richmond v. J.A. Croson Co., 488 U.S. 469, 518, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (KENNEDY, J., concurring in part and concurring in judgment). "At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." Miller v. Johnson, 515 U.S. 900, 911, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (internal quotation marks omitted). "Race-based assignments embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts-their very worth as citizens-according to a criterion barred to the Government by history and the Constitution." Id., at 912, 115 S.Ct. 2475 (internal quotation marks omitted). Given our constitutional commitment to "the doctrine of equality," " '[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people.' " Rice v. Cayetano, 528 U.S. 495, 517, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000) (quoting Hirabayashi v. United States, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943) ).
"[B]ecause racial characteristics so seldom provide a relevant basis for disparate treatment, the Equal Protection Clause demands that racial classifications ... be subjected to the most rigid scrutiny." Fisher I, 570 U.S., at ----, 133 S.Ct., at 2419 (internal quotation marks and citations omitted). "[J]udicial review must begin from the position that 'any official action that treats a person differently on account of his race or ethnic origin is inherently suspect.' " Ibid. ; see also Grutter, 539 U.S., at 388, 123 S.Ct. 2325 (KENNEDY, J., dissenting) (" 'Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination' "). Under strict scrutiny, the use of race must be "necessary to further a compelling governmental interest," and the means employed must be " 'specifically and narrowly' " tailored to accomplish the compelling interest. Id., at 327, 333, 123 S.Ct. 2325 (O'Connor, J., for the Court).
The "higher education dynamic does not change" this standard. Fisher I, supra, at ----, 133 S.Ct., at 2421. "Racial discrimination [is] invidious in all contexts," Edmonson v. Leesville Concrete Co., 500 U.S. 614, 619, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), and " '[t]he analysis and level of scrutiny applied to determine the validity of [a racial] classification do not vary simply because the objective appears acceptable,' " Fisher I, supra, at ----, 133 S.Ct., at 2421.
Nor does the standard of review " 'depen[d] on the race of those burdened or benefited by a particular classification.' " Gratz v. Bollinger, 539 U.S. 244, 270, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003) (quoting Adarand Constructors, Inc. v. Peã, 515 U.S. 200, 224, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) ); see also Miller, supra, at 904, 115 S.Ct. 2475 ("This rule obtains with equal force regardless of 'the race of those burdened or benefited by a particular classification' " (quoting Croson, supra, at 494, 109 S.Ct. 706 (plurality opinion of O'Connor, J.))). "Thus, 'any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest of judicial scrutiny.' " Gratz, supra, at 270, 123 S.Ct. 2411 (quoting Adarand, supra, at 224, 115 S.Ct. 2097 ).
In short, in "all contexts," Edmonson, supra, at 619, 111 S.Ct. 2077 racial classifications are permitted only "as a last resort," when all else has failed, Croson, supra, at 519, 109 S.Ct. 706 (opinion of *2222 KENNEDY, J.). "Strict scrutiny is a searching examination, and it is the government that bears the burden" of proof. Fisher I, 570 U.S., at ----, 133 S.Ct., at 2419. To meet this burden, the government must "demonstrate with clarity that its 'purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary ... to the accomplishment of its purpose.' " Id., at ----, 133 S.Ct., at 2418 (emphasis added).
B
Here, UT has failed to define its interest in using racial preferences with clarity. As a result, the narrow tailoring inquiry is impossible, and UT cannot satisfy strict scrutiny.
When UT adopted its challenged policy, it characterized its compelling interest as obtaining a " 'critical mass' " of underrepresented minorities. Id., at ----, 133 S.Ct., at 2415. The 2004 Proposal claimed that "[t]he use of race-neutral policies and programs has not been successful in achieving a critical mass of racial diversity." Supp. App. 25a; see Fisher v. University of Tex. at Austin, 631 F.3d 213, 226 (C.A.5 2011) ("[T]he 2004 Proposal explained that UT had not yet achieved the critical mass of underrepresented minority students needed to obtain the full educational benefits of diversity"). But to this day, UT has not explained in anything other than the vaguest terms what it means by "critical mass." In fact, UT argues that it need not identify any interest more specific than "securing the educational benefits of diversity." Brief for Respondents 15.
UT has insisted that critical mass is not an absolute number. See Tr. of Oral Arg. 39 (Oct. 10, 2012) (declaring that UT is not working toward any particular number of African-American or Hispanic students); App. 315a (confirming that UT has not defined critical mass as a number and has not projected when it will attain critical mass). Instead, UT prefers a deliberately malleable "we'll know it when we see it" notion of critical mass. It defines "critical mass" as "an adequate representation of minority students so that the ... educational benefits that can be derived from diversity can actually happen," and it declares that it "will ... know [that] it has reached critical mass" when it "see[s] the educational benefits happening." Id., at 314a-315a. In other words: Trust us.
This intentionally imprecise interest is designed to insulate UT's program from meaningful judicial review. As Judge Garza explained:
"[T]o meet its narrow tailoring burden, the University must explain its goal to us in some meaningful way. We cannot undertake a rigorous ends-to-means narrow tailoring analysis when the University will not define the ends. We cannot tell whether the admissions program closely 'fits' the University's goal when it fails to objectively articulate its goal. Nor can we determine whether considering race is necessary for the University to achieve 'critical mass,' or whether there are effective race-neutral alternatives, when it has not described what 'critical mass' requires." 758 F.3d, at 667 (dissenting opinion).
Indeed, without knowing in reasonably specific terms what critical mass is or how it can be measured, a reviewing court cannot conduct the requisite "careful judicial inquiry" into whether the use of race was " 'necessary.' " Fisher I, supra, at ----, 133 S.Ct., 2420.
To be sure, I agree with the majority that our precedents do not require UT to pinpoint "an interest in enrolling a certain number of minority students." Ante, at 2210. But in order for us to assess whether *2223 UT's program is narrowly tailored, the University must identify some sort of concrete interest . "Classifying and assigning" students according to race "requires more than ... an amorphous end to justify it." Parents Involved in Community Schools v. Seattle School Dist. No. 1, 551 U.S. 701, 735, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007). Because UT has failed to explain "with clarity," Fisher I, supra, at ----, 133 S.Ct., at 2418, why it needs a race-conscious policy and how it will know when its goals have been met, the narrow tailoring analysis cannot be meaningfully conducted. UT therefore cannot satisfy strict scrutiny.
The majority acknowledges that "asserting an interest in the educational benefits of diversity writ large is insufficient," and that "[a] university's goals cannot be elusory or amorphous-they must be sufficiently measurable to permit judicial scrutiny of the policies adopted to reach them." Ante, at 2211. According to the majority, however, UT has articulated the following "concrete and precise goals": "the destruction of stereotypes, the promot[ion of] cross-racial understanding, the preparation of a student body for an increasingly diverse workforce and society, and the cultivat[ion of] a set of leaders with legitimacy in the eyes of the citizenry." Ibid. (internal quotation marks omitted).
These are laudable goals, but they are not concrete or precise, and they offer no limiting principle for the use of racial preferences. For instance, how will a court ever be able to determine whether stereotypes have been adequately destroyed? Or whether cross-racial understanding has been adequately achieved? If a university can justify racial discrimination simply by having a few employees opine that racial preferences are necessary to accomplish these nebulous goals, see ante, at 2210 - 2211 (citing only self-serving statements from UT officials), then the narrow tailoring inquiry is meaningless. Courts will be required to defer to the judgment of university administrators, and affirmative-action policies will be completely insulated from judicial review.
By accepting these amorphous goals as sufficient for UT to carry its burden, the majority violates decades of precedent rejecting blind deference to government officials defending " 'inherently suspect' " classifications. Miller, 515 U.S., at 904, 115 S.Ct. 2475 (citing Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 291, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.)); see also, e.g., Miller, supra, at 922, 115 S.Ct. 2475 ("Our presumptive skepticism of all racial classifications ... prohibits us ... from accepting on its face the Justice Department's conclusion" (citation omitted)); Croson, 488 U.S., at 500, 109 S.Ct. 706 ("[T]he mere recitation of a 'benign' or legitimate purpose for a racial classification is entitled to little or no weight"); id., at 501, 109 S.Ct. 706 ("The history of racial classifications in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis"). Most troublingly, the majority's uncritical deference to UT's self-serving claims blatantly contradicts our decision in the prior iteration of this very case, in which we faulted the Fifth Circuit for improperly "deferring to the University's good faith in its use of racial classifications." Fisher I, 570 U.S., at ----, 133 S.Ct., at 2421. As we emphasized just three years ago, our precedent "ma[kes] clear that it is for the courts, not for university administrators, to ensure that" an admissions process is narrowly tailored. Id., at ----, 133 S.Ct., at 2420.
A court cannot ensure that an admissions process is narrowly tailored if it cannot pin down the goals that the process is designed to achieve. UT's vague policy *2224 goals are "so broad and imprecise that they cannot withstand strict scrutiny." Parents Involved, supra, at 785, 127 S.Ct. 2738 (KENNEDY, J., concurring in part and concurring in judgment).
C
Although UT's primary argument is that it need not point to any interest more specific than "the educational benefits of diversity," Brief for Respondents 15, it has-at various points in this litigation-identified four more specific goals: demographic parity, classroom diversity, intraracial diversity, and avoiding racial isolation. Neither UT nor the majority has demonstrated that any of these four goals provides a sufficient basis for satisfying strict scrutiny. And UT's arguments to the contrary depend on a series of invidious assumptions.
1
First, both UT and the majority cite demographic data as evidence that African-American and Hispanic students are "underrepresented" at UT and that racial preferences are necessary to compensate for this underrepresentation. See, e.g., Supp. App. 24a; ante, at 2211 - 2212. But neither UT nor the majority is clear about the relationship between Texas demographics and UT's interest in obtaining a critical mass.
Does critical mass depend on the relative size of a particular group in the population of a State? For example, is the critical mass of African-Americans and Hispanics in Texas, where African-Americans are about 11.8% of the population and Hispanics are about 37.6%, different from the critical mass in neighboring New Mexico, where the African-American population is much smaller (about 2.1%) and the Hispanic population constitutes a higher percentage of the State's total (about 46.3%)? See United States Census Bureau, QuickFacts, online at https://www.census.gov/quickfacts/table/PST045215/35,48 (all Internet materials as last visited June 21, 2016).
UT's answer to this question has veered back and forth. At oral argument in Fisher I, UT's lawyer indicated that critical mass "could" vary "from group to group" and from "state to state." See Tr. of Oral Arg. 40 (Oct. 10, 2012). And UT initially justified its race-conscious plan at least in part on the ground that "significant differences between the racial and ethnic makeup of the University's undergraduate population and the state's population prevent the University from fully achieving its mission." Supp. App. 24a; see also id., at 16a ("[A] critical mass in Texas is necessarily larger than a critical mass in Michigan," because "[a] majority of the college-age population in Texas is African American or Hispanic"); Fisher, 631 F.3d, at 225-226, 236 (concluding that UT's reliance on Texas demographics reflects "measured attention to the community it serves"); Brief for Respondents in No. 11-345, at 41 (noting that critical mass may hinge, in part, on "the communities that universities serve"). UT's extensive reliance on state demographics is also revealed by its substantial focus on increasing the representation of Hispanics, but not Asian-Americans, see, e.g., 645 F.Supp.2d, at 606 ; Supp. App. 25a; App. 445a-446a, because Hispanics, but not Asian-Americans, are underrepresented at UT when compared to the demographics of the State.[2]
*2225 On the other hand, UT's counsel asserted that the critical mass for the University is "not at all" dependent on the demographics of Texas, and that UT's "concept [of] critical mass isn't tied to demographic[s]." Tr. of Oral Arg. 40, 49 (Oct. 10, 2012). And UT's Fisher I brief expressly agreed that "a university cannot look to racial demographics-and then work backward in its admissions process to meet a target tied to such demographics." Brief for Respondents in No. 11-345, at 31; see also Brief for Respondents 26-27 (disclaiming any interest in demographic parity).
To the extent that UT is pursuing parity with Texas demographics, that is nothing more than "outright racial balancing," which this Court has time and again held "patently unconstitutional." Fisher I, 570 U.S., at ----, 133 S.Ct., at 2419 ; see Grutter, 539 U.S., at 330, 123 S.Ct. 2325 ("[O]utright racial balancing ... is patently unconstitutional"); Freeman v. Pitts, 503 U.S. 467, 494, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992) ("Racial balance is not to be achieved for its own sake"); Croson, 488 U.S., at 507, 109 S.Ct. 706 (rejecting goal of "outright racial balancing"); Bakke, 438 U.S., at 307, 98 S.Ct. 2733 (opinion of Powell, J.) ("If petitioner's purpose is to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin, such a preferential purpose must be rejected ... as facially invalid"). An interest "linked to nothing other than proportional representation of various races ... would support indefinite use of racial classifications, employed first to obtain the appropriate mixture of racial views and then to ensure that the [program] continues to reflect that mixture." Metro Broadcasting, Inc. v. FCC, 497 U.S. 547, 614, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) (O'Connor, J., dissenting). And as we held in Fisher I, " '[r]acial balancing is not transformed from "patently unconstitutional" to a compelling state interest simply by relabeling it "racial diversity." ' " 570 U.S., at ----, 133 S.Ct., at 2419 (quoting Parents Involved, 551 U.S., at 732, 127 S.Ct. 2738 ).
The record here demonstrates the pitfalls inherent in racial balancing. Although UT claims an interest in the educational benefits of diversity, it appears to have paid little attention to anything other than the number of minority students on its campus and in its classrooms. UT's 2004 Proposal illustrates this approach by repeatedly citing numerical assessments of the racial makeup of the student body and various classes as the justification for adopting a race-conscious plan. See, e.g., Supp. App. 24a-26a, 30a. Instead of focusing on the benefits of diversity, UT seems to have resorted to a simple racial census.
The majority, for its part, claims that "[a]lthough demographics alone are by no means dispositive, they do have some value as a gauge of the University's ability to enroll students who can offer underrepresented perspectives." Ante, at 2212. But even if UT merely "view[s] the demographic disparity as cause for concern," Brief for United States as Amicus Curiae 29, and is seeking only to reduce-rather than eliminate-the disparity, that undefined goal cannot be properly subjected to strict scrutiny. In that case, there is simply no way for a court to know what specific demographic interest UT is pursuing, why a race-neutral alternative could not achieve that interest, and when that demographic goal would be satisfied. If a demographic discrepancy can serve as "a gauge" that justifies the use of racial discrimination, *2226 ante, at 2211 - 2212, then racial discrimination can be justified on that basis until demographic parity is reached. There is no logical stopping point short of patently unconstitutional racial balancing. Demographic disparities thus cannot be used to satisfy strict scrutiny here. See Croson, supra, at 498, 109 S.Ct. 706 (rejecting a municipality's assertion that its racial set-aside program was justified in light of past discrimination because that assertion had " 'no logical stopping point' " and could continue until the percentage of government contracts awarded to minorities "mirrored the percentage of minorities in the population as a whole"); Wygant v. Jackson Bd. of Ed., 476 U.S. 267, 275, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (plurality opinion) (rejecting the government's asserted interest because it had "no logical stopping point").
2
The other major explanation UT offered in the Proposal was its desire to promote classroom diversity. The Proposal stressed that UT "has not reached a critical mass at the classroom level ." Supp. App. 24a (emphasis added); see also id., at 1a, 25a, 39a; App. 316a. In support of this proposition, UT relied on a study of select classes containing five or more students. As noted above, the study indicated that 52% of these classes had no African-Americans, 16% had no Asian-Americans, and 12% had no Hispanics. Supp. App. 26a. The study further suggested that only 21% of these classes had two or more African-Americans, 67% had two or more Asian-Americans, and 70% had two or more Hispanics. See ibid. Based on this study, UT concluded that it had a "compelling educational interest" in employing racial preferences to ensure that it did not "have large numbers of classes in which there are no students-or only a single student-of a given underrepresented race or ethnicity." Id., at 25a.
UT now equivocates, disclaiming any discrete interest in classroom diversity. See Brief for Respondents 26-27. Instead, UT has taken the position that the lack of classroom diversity was merely a "red flag that UT had not yet fully realized" "the constitutionally permissible educational benefits of diversity." Brief for Respondents in No. 11-345, at 43. But UT has failed to identify the level of classroom diversity it deems sufficient, again making it impossible to apply strict scrutiny.[3] A reviewing court cannot determine whether UT's race-conscious program was necessary to remove the so-called "red flag" without understanding the precise nature of that goal or knowing when the "red flag" will be considered to have disappeared.
Putting aside UT's effective abandonment of its interest in classroom diversity, the evidence cited in support of that interest is woefully insufficient to show that UT's race-conscious plan was necessary to achieve the educational benefits of a diverse student body. As far as the record shows, UT failed to even scratch the surface of the available data before reflexively resorting to racial preferences. For instance, because UT knows which students were admitted through the Top Ten Percent Plan and which were not, as well as which students enrolled in which classes, it would seem relatively easy to determine whether Top Ten Percent students were more or less likely than holistic admittees to enroll in the types of classes where diversity was lacking. But UT never bothered to figure this out. See ante, at 2209 *2227 (acknowledging that UT submitted no evidence regarding "how students admitted solely based on their class rank differ in their contribution to diversity from students admitted through holistic review"). Nor is there any indication that UT instructed admissions officers to search for African-American and Hispanic applicants who would fill particular gaps at the classroom level. Given UT's failure to present such evidence, it has not demonstrated that its race-conscious policy would promote classroom diversity any better than race-neutral options, such as expanding the Top Ten Percent Plan or using race-neutral holistic admissions.
Moreover, if UT is truly seeking to expose its students to a diversity of ideas and perspectives, its policy is poorly tailored to serve that end. UT's own study-which the majority touts as the best "nuanced quantitative data" supporting UT's position, ante, at 2212-demonstrated that classroom diversity was more lacking for students classified as Asian-American than for those classified as Hispanic. Supp. App. 26a. But the UT plan discriminates against Asian-American students.[4] UT is apparently unconcerned that Asian-Americans "may be made to feel isolated or may be seen as ... 'spokesperson[s]' of their race or ethnicity." Id., at 69a; see id., at 25a. And unless the University is engaged in unconstitutional racial balancing based on Texas demographics (where Hispanics outnumber Asian-Americans), see Part II-C-1, supra, it seemingly views the classroom contributions of Asian-American students as less valuable than those of Hispanic students. In UT's view, apparently, "Asian Americans are not worth as much as Hispanics in promoting 'cross-racial understanding,' breaking down 'racial stereotypes,' and enabling students to 'better understand persons of different races.' " Brief for Asian American Legal Foundation et al. as Amici Curiae 11 (representing 117 Asian-American organizations). The majority opinion effectively endorses this view, crediting UT's reliance on the classroom study as proof that the University assessed its need for racial discrimination (including racial discrimination that undeniably harms Asian-Americans) "with care." Ante, at 2212.
While both the majority and the Fifth Circuit rely on UT's classroom study, see ante, at 2223; 758 F.3d, at 658-659, they completely ignore its finding that Hispanics are better represented than Asian-Americans in UT classrooms. In fact, they act almost as if Asian-American students do not exist. See ante, at 2211 - 2212 (mentioning Asian-Americans only a single time outside of parentheticals, and not in the context of the classroom study); 758 F.3d, at 658 (mentioning Asian-Americans only a single time).[5] Only the District *2228 Court acknowledged the impact of UT's policy on Asian-American students. But it brushed aside this impact, concluding-astoundingly-that UT can pick and choose which racial and ethnic groups it would like to favor. According to the District Court, "nothing in Grutter requires a university to give equal preference to every minority group," and UT is allowed "to exercise its discretion in determining which minority groups should benefit from the consideration of race." 645 F.Supp.2d, at 606.
This reasoning, which the majority implicitly accepts by blessing UT's reliance on the classroom study, places the Court on the "tortuous" path of "decid[ing] which races to favor." Metro Broadcasting, 497 U.S., at 632, 110 S.Ct. 2997 (KENNEDY, J., dissenting). And the Court's willingness to allow this "discrimination against individuals of Asian descent in UT admissions is particularly troubling, in light of the long history of discrimination against Asian Americans, especially in education." Brief for Asian American Legal Foundation et al. as Amici Curiae 6; see also, e.g., id., at 16-17 (discussing the placement of Chinese-Americans in " 'separate but equal' " public schools); Gong Lum v. Rice, 275 U.S. 78, 81-82, 48 S.Ct. 91, 72 L.Ed. 172 (1927) (holding that a 9-year-old Chinese-American girl could be denied entry to a "white" school because she was "a member of the Mongolian or yellow race"). In sum, "[w]hile the Court repeatedly refers to the preferences as favoring 'minorities,' ... it must be emphasized that the discriminatory policies upheld today operate to exclude" Asian-American students, who "have not made [UT's] list" of favored groups. Metro Broadcasting, supra, at 632, 110 S.Ct. 2997 (KENNEDY, J., dissenting).
Perhaps the majority finds discrimination against Asian-American students benign, since Asian-Americans are "overrepresented " at UT. 645 F.Supp.2d, at 606. But "[h]istory should teach greater humility." Metro Broadcasting, 497 U.S., at 609, 110 S.Ct. 2997 (O'Connor, J., dissenting). " '[B]enign' carries with it no independent meaning, but reflects only acceptance of the current generation's conclusion that a politically acceptable burden, imposed on particular citizens on the basis of race, is reasonable." Id., at 610, 110 S.Ct. 2997. Where, as here, the government has provided little explanation for why it needs to discriminate based on race, " 'there is simply no way of determining what classifications are "benign" ... and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.' " Parents Involved, 551 U.S., at 783, 127 S.Ct. 2738 (opinion of KENNEDY, *2229 J.) (quoting Croson, 488 U.S., at 493, 109 S.Ct. 706 (plurality opinion of O'Connor, J.)). By accepting the classroom study as proof that UT satisfied strict scrutiny, the majority "move[s] us from 'separate but equal' to 'unequal but benign.' " Metro Broadcasting, supra, at 638, 110 S.Ct. 2997 (KENNEDY, J., dissenting).
In addition to demonstrating that UT discriminates against Asian-American students, the classroom study also exhibits UT's use of a few crude, overly simplistic racial and ethnic categories. Under the UT plan, both the favored and the disfavored groups are broad and consist of students from enormously diverse backgrounds. See Supp. App. 30a; see also Fisher I, 570 U.S., at ----, 133 S.Ct., at 2416 ("five predefined racial categories"). Because "[c]rude measures of this sort threaten to reduce [students] to racial chits," Parents Involved, 551 U.S., at 798, 127 S.Ct. 2738 (opinion of KENNEDY, J.), UT's reliance on such measures further undermines any claim based on classroom diversity statistics, see id., at 723, 127 S.Ct. 2738 (majority opinion) (criticizing school policies that viewed race in rough "white/nonwhite" or "black/'other' " terms); id., at 786, 127 S.Ct. 2738 (opinion of KENNEDY, J.) (faulting government for relying on "crude racial categories"); Metro Broadcasting, supra, at 633, n. 1, 110 S.Ct. 2997 (KENNEDY, J., dissenting) (concluding that " 'the very attempt to define with precision a beneficiary's qualifying racial characteristics is repugnant to our constitutional ideals,' " and noting that if the government " 'is to make a serious effort to define racial classes by criteria that can be administered objectively, it must study precedents such as the First Regulation to the Reichs Citizenship Law of November 14, 1935' ").
For example, students labeled "Asian American," Supp. App. 26a, seemingly include "individuals of Chinese, Japanese, Korean, Vietnamese, Cambodian, Hmong, Indian and other backgrounds comprising roughly 60% of the world's population," Brief for Asian American Legal Foundation et al. as Amici Curiae, O.T. 2012, No. 11-345, p. 28.[6] It would be ludicrous to suggest that all of these students have similar backgrounds and similar ideas and experiences to share. So why has UT lumped them together and concluded that it is appropriate to discriminate against Asian-American students because they are "overrepresented" in the UT student body? UT has no good answer. And UT makes no effort to ensure that it has a critical mass of, say, "Filipino Americans" or "Cambodian Americans." Tr. of Oral Arg. 52 (Oct. 10, 2012). As long as there are a sufficient number of "Asian Americans," UT is apparently satisfied.
UT's failure to provide any definition of the various racial and ethnic groups is also revealing. UT does not specify what it means to be "African-American," "Hispanic," "Asian American," "Native American," or "White." Supp. App. 30a. And UT evidently labels each student as falling into only a single racial or ethnic group, see, e.g., id., at 10a-13a, 30a, 43a-44a, 71a, 156a-157a, 169a-170a, without explaining how individuals with ancestors from different groups are to be characterized. As racial and ethnic prejudice recedes, more and more students will have parents (or grandparents) who fall into more than one of UT's five groups. According to census figures, individuals describing themselves *2230 as members of multiple races grew by 32% from 2000 to 2010.[7] A recent survey reported that 26% of Hispanics and 28% of Asian-Americans marry a spouse of a different race or ethnicity.[8] UT's crude classification system is ill suited for the more integrated country that we are rapidly becoming. UT assumes that if an applicant describes himself or herself as a member of a particular race or ethnicity, that applicant will have a perspective that differs from that of applicants who describe themselves as members of different groups. But is this necessarily so? If an applicant has one grandparent, great-grandparent, or great-great-grandparent who was a member of a favored group, is that enough to permit UT to infer that this student's classroom contribution will reflect a distinctive perspective or set of experiences associated with that group? UT does not say. It instead relies on applicants to "classify themselves." Fisher I, 570 U.S., at ----, 133 S.Ct., at 2416. This is an invitation for applicants to game the system.
Finally, it seems clear that the lack of classroom diversity is attributable in good part to factors other than the representation of the favored groups in the UT student population. UT offers an enormous number of classes in a wide range of subjects, and it gives undergraduates a very large measure of freedom to choose their classes. UT also offers courses in subjects that are likely to have special appeal to members of the minority groups given preferential treatment under its challenged plan, and this of course diminishes the number of other courses in which these students can enroll. See, e.g., Supp. App. 72a-73a (indicating that the representation of African-Americans and Hispanics in UT classrooms varies substantially from major to major). Having designed an undergraduate program that virtually ensures a lack of classroom diversity, UT is poorly positioned to argue that this very result provides a justification for racial and ethnic discrimination, which the Constitution rarely allows.
3
UT's purported interest in intraracial diversity, or "diversity within diversity," Brief for Respondents 34, also falls short. At bottom, this argument relies on the unsupported assumption that there is something deficient or at least radically different about the African-American and Hispanic students admitted through the Top Ten Percent Plan.
Throughout this litigation, UT has repeatedly shifted its position on the need for intraracial diversity. Initially, in the 2004 Proposal, UT did not rely on this alleged need at all. Rather, the Proposal "examined two metrics-classroom diversity and demographic disparities-that it concluded were relevant to its ability to provide [the] benefits of diversity." Brief for United States as Amicus Curiae 27-28. Those metrics looked only to the numbers of African-Americans and Hispanics, not to diversity within each group.
On appeal to the Fifth Circuit and in Fisher I, however, UT began to emphasize *2231 its intraracial diversity argument. UT complained that the Top Ten Percent Law hinders its efforts to assemble a broadly diverse class because the minorities admitted under that law are drawn largely from certain areas of Texas where there are majority-minority schools. These students, UT argued, tend to come from poor, disadvantaged families, and the University would prefer a system that gives it substantial leeway to seek broad diversity within groups of underrepresented minorities. In particular, UT asserted a need for more African-American and Hispanic students from privileged backgrounds. See, e.g., Brief for Respondents in No. 11-345, at 34 (explaining that UT needs race-conscious admissions in order to admit "[t]he African-American or Hispanic child of successful professionals in Dallas"); ibid. (claiming that privileged minorities "have great potential for serving as a 'bridge' in promoting cross-racial understanding, as well as in breaking down racial stereotypes"); ibid. (intimating that the underprivileged minority students admitted under the Top Ten Percent Plan "reinforc[e] " "stereotypical assumptions"); Tr. of Oral Arg. 43-45 (Oct. 10, 2012) ("[A]lthough the percentage plan certainly helps with minority admissions, by and large, the-the minorities who are admitted tend to come from segregated, racially-identifiable schools," and "we want minorities from different backgrounds"). Thus, the Top Ten Percent Law is faulted for admitting the wrong kind of African-American and Hispanic students .
The Fifth Circuit embraced this argument on remand, endorsing UT's claimed need to enroll minorities from "high-performing," "majority-white" high schools. 758 F.3d, at 653. According to the Fifth Circuit, these more privileged minorities "bring a perspective not captured by" students admitted under the Top Ten Percent Law, who often come "from highly segregated, underfunded, and underperforming schools." Ibid. For instance, the court determined, privileged minorities "can enrich the diversity of the student body in distinct ways" because such students have "higher levels of preparation and better prospects for admission to UT Austin's more demanding colleges" than underprivileged minorities. Id., at 654 ; see also Fisher, 631 F.3d, at 240, n. 149 (concluding that the Top Ten Percent Plan "widens the 'credentials gap' between minority and non-minority students at the University, which risks driving away matriculating minority students from difficult majors like business or the sciences").
Remarkably, UT now contends that petitioner has "fabricat[ed]" the argument that it is seeking affluent minorities. Brief for Respondents 2. That claim is impossible to square with UT's prior statements to this Court in the briefing and oral argument in Fisher I .[9] Moreover, although UT reframes *2232 its argument, it continues to assert that it needs affirmative action to admit privileged minorities. For instance, UT's brief highlights its interest in admitting "[t]he black student with high grades from Andover." Brief for Respondents 33. Similarly, at oral argument, UT claimed that its "interests in the educational benefits of diversity would not be met if all of [the] minority students were ... coming from depressed socioeconomic backgrounds." Tr. of Oral Arg. 53 (Dec. 9, 2015); see also id., at 43, 45.
Ultimately, UT's intraracial diversity rationale relies on the baseless assumption that there is something wrong with African-American and Hispanic students admitted through the Top Ten Percent Plan, because they are "from the lower-performing, racially identifiable schools." Id., at 43; see id., at 42-43 (explaining that "the basis" for UT's conclusion that it was "not getting a variety of perspectives among African-Americans or Hispanics" was the fact that the Top Ten Percent Plan admits underprivileged minorities from highly segregated schools). In effect, UT asks the Court "to assume "-without any evidence-"that minorities admitted under the Top Ten Percent Law ... are somehow more homogenous, less dynamic, and more undesirably stereotypical than those admitted under holistic review." 758 F.3d, at 669-670 (Garza, J., dissenting). And UT's assumptions appear to be based on the pernicious stereotype that the African-Americans and Hispanics admitted through the Top Ten Percent Plan only got in because they did not have to compete against very many whites and Asian-Americans. See Tr. of Oral Arg. 42-43 (Dec. 9, 2015). These are "the very stereotypical assumptions [that] the Equal Protection Clause forbids." Miller, 515 U.S., at 914, 115 S.Ct. 2475. UT cannot satisfy its burden by attempting to "substitute racial stereotype for evidence, and racial prejudice for reason." Calhoun v. United States, 568 U.S. ----, ----, 133 S.Ct. 1136, 1137, 185 L.Ed.2d 385 (2013) (SOTOMAYOR, J., respecting denial of certiorari).
In addition to relying on stereotypes, UT's argument that it needs racial preferences to admit privileged minorities turns the concept of affirmative action on its head. When affirmative action programs were first adopted, it was for the purpose of helping the disadvantaged. See, e.g., Bakke, 438 U.S., at 272-275, 98 S.Ct. 2733 (opinion of Powell, J.) (explaining that the school's affirmative action program was designed "to increase the representation" of " 'economically and/or educationally disadvantaged' applicants"). Now we are told that a program that tends to admit poor and disadvantaged minority students is inadequate because it does not work to the advantage of those who are more fortunate. This is affirmative action gone wild.
It is also far from clear that UT's assumptions about the socioeconomic status of minorities admitted through the Top Ten Percent Plan are even remotely accurate. Take, for example, parental education. In 2008, when petitioner applied to UT, approximately 79% of Texans aged 25 years or older had a high school diploma, 17% had a bachelor's degree, and 8% had a graduate or professional degree. Dept. of Educ., Nat. Center for Educ. Statistics, T. Snyder & S. Dillow, Digest of Education Statistics 2010, p. 29 (2011). In contrast, 96% of African-Americans admitted through the Top Ten Percent Plan had a *2233 parent with a high school diploma, 59% had a parent with a bachelor's degree, and 26% had a parent with a graduate or professional degree. See UT, Office of Admissions, Student Profile, Admitted Freshman Class of 2008, p. 8 (rev. Aug. 1, 2012) (2008 Student Profile), online at https://uteas.app.box.com/s/twqozsbm2vb9lhm14o0v0czvqs1ygzqr/1/7732448553/23476747441/1. Similarly, 83% of Hispanics admitted through the Top Ten Percent Plan had a parent with a high school diploma, 42% had a parent with a bachelor's degree, and 21% had a parent with a graduate or professional degree. Ibid. As these statistics make plain, the minorities that UT characterizes as "coming from depressed socioeconomic backgrounds," Tr. of Oral Arg. 53 (Dec. 9, 2015), generally come from households with education levels exceeding the norm in Texas.
Or consider income levels. In 2008, the median annual household income in Texas was $49,453. United States Census Bureau, A. Noss, Household Income for States: 2008 and 2009, p. 4 (2010), online at https://www.census.gov/prod/2010pubs/acsbr09-2.pdf. The household income levels for Top Ten Percent African-American and Hispanic admittees were on par: Roughly half of such admittees came from households below the Texas median, and half came from households above the median. See 2008 Student Profile 6. And a large portion of these admittees are from households with income levels far exceeding the Texas median. Specifically, 25% of African-Americans and 27% of Hispanics admitted through the Top Ten Percent Plan in 2008 were raised in households with incomes exceeding $80,000. Ibid. In light of this evidence, UT's actual argument is not that it needs affirmative action to ensure that its minority admittees are representative of the State of Texas. Rather, UT is asserting that it needs affirmative action to ensure that its minority students disproportionally come from families that are wealthier and better educated than the average Texas family.
In addition to using socioeconomic status to falsely denigrate the minority students admitted through the Top Ten Percent Plan, UT also argues that such students are academically inferior. See, e.g., Brief for Respondents in No. 11-345, at 33 ("[T]he top 10% law systematically hinders UT's efforts to assemble a class that is ... academically excellent"). "On average," UT claims, "African-American and Hispanic holistic admits have higher SAT scores than their Top 10% counterparts." Brief for Respondents 43, n. 8. As a result, UT argues that it needs race-conscious admissions to enroll academically superior minority students with higher SAT scores. Regrettably, the majority seems to embrace this argument as well. See ante, at 2213 ("[T]he Equal Protection Clause does not force universities to choose between a diverse student body and a reputation for academic excellence").
This argument fails for a number of reasons. First, it is simply not true that Top Ten Percent minority admittees are academically inferior to holistic admittees. In fact, as UT's president explained in 2000, "top 10 percent high school students make much higher grades in college than non-top 10 percent students," and "[s]trong academic performance in high school is an even better predictor of success in college than standardized test scores." App. 393a-394a; see also Lavergne Deposition 41-42 (agreeing that "it's generally true that students admitted pursuant to HB 588 [the Top Ten Percent Law] have a higher level of academic performance at the University than students admitted outside of HB 588"). Indeed, the statistics in the record reveal that, for each year between 2003 and 2007, African-American in-state freshmen who were admitted *2234 under the Top Ten Percent Law earned a higher mean grade point average than those admitted outside of the Top Ten Percent Law. Supp. App. 164a. The same is true for Hispanic students. Id., at 165a. These conclusions correspond to the results of nationwide studies showing that high school grades are a better predictor of success in college than SAT scores.[10]
It is also more than a little ironic that UT uses the SAT, which has often been accused of reflecting racial and cultural bias,[11] as a reason for dissatisfaction with poor and disadvantaged African-American and Hispanic students who excel both in high school and in college. Even if the SAT does not reflect such bias (and I am ill equipped to express a view on that subject), SAT scores clearly correlate with wealth.[12]
UT certainly has a compelling interest in admitting students who will achieve academic success, but it does not follow that it has a compelling interest in maximizing admittees' SAT scores. Approximately 850 4-year-degree institutions do not require the SAT or ACT as part of the admissions process. See J. Soares, SAT Wars: The Case for Test-Optional College Admissions 2 (2012). This includes many excellent schools.[13]
*2235 To the extent that intraracial diversity refers to something other than admitting privileged minorities and minorities with higher SAT scores, UT has failed to define that interest with any clarity. UT "has not provided any concrete targets for admitting more minority students possessing [the] unique qualitative-diversity characteristics" it desires. 758 F.3d, at 669 (Garza, J., dissenting). Nor has UT specified which characteristics, viewpoints, and life experiences are supposedly lacking in the African-Americans and Hispanics admitted through the Top Ten Percent Plan. In fact, because UT administrators make no collective, qualitative assessment of the minorities admitted automatically, they have no way of knowing which attributes are missing. See ante, at 2209 (admitting that there is no way of knowing "how students admitted solely based on their class rank differ in their contribution to diversity from students admitted through holistic review"); 758 F.3d, at 669 (Garza, J., dissenting) ("The University does not assess whether Top Ten Percent Law admittees exhibit sufficient diversity within diversity, whether the requisite 'change agents' are among them, and whether these admittees are able, collectively or individually, to combat pernicious stereotypes"). Furthermore, UT has not identified "when, if ever, its goal (which remains undefined) for qualitative diversity will be reached." Id., at 671. UT's intraracial diversity rationale is thus too imprecise to permit strict scrutiny analysis.
Finally, UT's shifting positions on intraracial diversity, and the fact that intraracial diversity was not emphasized in the Proposal, suggest that it was not "the actual purpose underlying the discriminatory classification." Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 730, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982). Instead, it appears to be a post hoc rationalization.
4
UT also alleges-and the majority embraces-an interest in avoiding "feelings of loneliness and isolation" among minority students. Ante, at 2212; see Brief for Respondents 7-8, 38-39. In support of this argument, they cite only demographic data and anecdotal statements by UT officials that some students (we are not told how many) feel "isolated." This vague interest cannot possibly satisfy strict scrutiny.
*2236 If UT is seeking demographic parity to avoid isolation, that is impermissible racial balancing. See Part II-C-1, supra . And linking racial loneliness and isolation to state demographics is illogical. Imagine, for example, that an African-American student attends a university that is 20% African-American. If racial isolation depends on a comparison to state demographics, then that student is more likely to feel isolated if the school is located in Mississippi (which is 37.0% African-American) than if it is located in Montana (which is 0.4% African-American). See United States Census Bureau, QuickFacts, online at https://www.census.gov/quickfacts/table/PST045215/28,30. In reality, however, the student may feel-if anything-less isolated in Mississippi, where African-Americans are more prevalent in the population at large.
If, on the other hand, state demographics are not driving UT's interest in avoiding racial isolation, then its treatment of Asian-American students is hard to understand. As the District Court noted, "the gross number of Hispanic students attending UT exceeds the gross number of Asian-American students." 645 F.Supp.2d, at 606. In 2008, for example, UT enrolled 1,338 Hispanic freshmen and 1,249 Asian-American freshmen. Supp. App. 156a. UT never explains why the Hispanic students-but not the Asian-American students-are isolated and lonely enough to receive an admissions boost, notwithstanding the fact that there are more Hispanics than Asian-Americans in the student population. The anecdotal statements from UT officials certainly do not indicate that Hispanics are somehow lonelier than Asian-Americans.
Ultimately, UT has failed to articulate its interest in preventing racial isolation with any clarity, and it has provided no clear indication of how it will know when such isolation no longer exists. Like UT's purported interests in demographic parity, classroom diversity, and intraracial diversity, its interest in avoiding racial isolation cannot justify the use of racial preferences.
D
Even assuming UT is correct that, under Grutter, it need only cite a generic interest in the educational benefits of diversity, its plan still fails strict scrutiny because it is not narrowly tailored. Narrow tailoring requires "a careful judicial inquiry into whether a university could achieve sufficient diversity without using racial classifications." Fisher I, 570 U.S., at ----, 133 S.Ct., at 2420. "If a ' "nonracial approach ... could promote the substantial interest about as well and at tolerable administrative expense," ' then the university may not consider race." Id., at ----, 133 S.Ct., at 2420 (citations omitted). Here, there is no evidence that race-blind, holistic review would not achieve UT's goals at least "about as well" as UT's race-based policy. In addition, UT could have adopted other approaches to further its goals, such as intensifying its outreach efforts, uncapping the Top Ten Percent Law, or placing greater weight on socioeconomic factors.
The majority argues that none of these alternatives is "a workable means for the University to attain the benefits of diversity it sought." Ante, at 2212. Tellingly, however, the majority devotes only a single, conclusory sentence to the most obvious race-neutral alternative: race-blind, holistic review that considers the applicant's unique characteristics and personal circumstances. See ibid.[14] Under a system *2237 that combines the Top Ten Percent Plan with race-blind, holistic review, UT could still admit "the star athlete or musician whose grades suffered because of daily practices and training," the "talented young biologist who struggled to maintain above-average grades in humanities classes," and the "student whose freshman-year grades were poor because of a family crisis but who got herself back on track in her last three years of school." Ante, at 2213. All of these unique circumstances can be considered without injecting race into the process. Because UT has failed to provide any evidence whatsoever that race-conscious holistic review will achieve its diversity objectives more effectively than race-blind holistic review, it cannot satisfy the heavy burden imposed by the strict scrutiny standard.
The fact that UT's racial preferences are unnecessary to achieve its stated goals is further demonstrated by their minimal effect on UT's diversity. In 2004, when race was not a factor, 3.6% of non-Top Ten Percent Texas enrollees were African-American and 11.6% were Hispanic. See Supp. App. 157a. It would stand to reason that at least the same percentages of African-American and Hispanic students would have been admitted through holistic review in 2008 even if race were not a factor. If that assumption is correct, then race was determinative for only 15 African-American students and 18 Hispanic students in 2008 (representing 0.2% and 0.3%, respectively, of the total enrolled first-time freshmen from Texas high schools). See ibid.[15]
The majority contends that "[t]he fact that race consciousness played a role in only a small portion of admissions decisions should be a hallmark of narrow tailoring, not evidence of unconstitutionality." Ante, at 2212. This argument directly contradicts this Court's precedent. Because racial classifications are " 'a highly suspect tool,' " Grutter, 539 U.S., at 326, 123 S.Ct. 2325 they should be employed only "as a last resort," Croson, 488 U.S., at 519, 109 S.Ct. 706 (opinion of KENNEDY, J.); see also Grutter, supra, at 342, 123 S.Ct. 2325 ("[R]acial classifications, however compelling their goals, are potentially so dangerous that they may be employed no more broadly than the interest demands"). Where, as here, racial preferences have only a slight impact on minority enrollment, a race-neutral alternative *2238 likely could have reached the same result. See Parents Involved, 551 U.S., at 733-734, 127 S.Ct. 2738 (holding that the "minimal effect" of school districts' racial classifications "casts doubt on the necessity of using [such] classifications" and "suggests that other means [of achieving their objectives] would be effective"). As Justice KENNEDY once aptly put it, "the small number of [students] affected suggests that the schoo[l] could have achieved [its] stated ends through different means." Id., at 790, 127 S.Ct. 2738 (opinion concurring in part and concurring in judgment). And in this case, a race-neutral alternative could accomplish UT's objectives without gratuitously branding the covers of tens of thousands of applications with a bare racial stamp and "tell[ing] each student he or she is to be defined by race." Id., at 789, 127 S.Ct. 2738.
III
The majority purports to agree with much of the above analysis. The Court acknowledges that " 'because racial characteristics so seldom provide a relevant basis for disparate treatment,' " " '[r]ace may not be considered [by a university] unless the admissions process can withstand strict scrutiny.' " Ante, at 2208. The Court admits that the burden of proof is on UT, ante, at 2208, and that "a university bears a heavy burden in showing that it had not obtained the educational benefits of diversity before it turned to a race-conscious plan," ante, at 2211. And the Court recognizes that the record here is "almost devoid of information about the students who secured admission to the University through the Plan," and that "[t]he Court thus cannot know how students admitted solely based on their class rank differ in their contribution to diversity from students admitted through holistic review." Ante, at 2209. This should be the end of the case: Without identifying what was missing from the African-American and Hispanic students it was already admitting through its race-neutral process, and without showing how the use of race-based admissions could rectify the deficiency, UT cannot demonstrate that its procedure is narrowly tailored.
Yet, somehow, the majority concludes that petitioner must lose as a result of UT's failure to provide evidence justifying its decision to employ racial discrimination. Tellingly, the Court frames its analysis as if petitioner bears the burden of proof here. See ante, at 2220 - 2225. But it is not the petitioner's burden to show that the consideration of race is unconstitutional. To the extent the record is inadequate, the responsibility lies with UT. For "[w]hen a court subjects governmental action to strict scrutiny, it cannot construe ambiguities in favor of the State," Parents Involved, supra, at 786, 127 S.Ct. 2738 (opinion of KENNEDY, J.), particularly where, as here, the summary judgment posture obligates the Court to view the facts in the light most favorable to petitioner, see Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
Given that the University bears the burden of proof, it is not surprising that UT never made the argument that it should win based on the lack of evidence. UT instead asserts that "if the Court believes there are any deficiencies in [the] record that cast doubt on the constitutionality of UT's policy, the answer is to order a trial, not to grant summary judgment." Brief for Respondents 51; see also id., at 52-53 ("[I]f this Court has any doubts about how the Top 10% Law works, or how UT's holistic plan offsets the tradeoffs of the Top 10% Law, the answer is to remand for a trial"). Nevertheless, the majority cites three reasons for breaking from the normal *2239 strict scrutiny standard. None of these is convincing.
A
First, the Court states that, while "th[e] evidentiary gap perhaps could be filled by a remand to the district court for further factfinding" in "an ordinary case," that will not work here because "[w]hen petitioner's application was rejected, ... the University's combined percentage-plan/holistic-review approach to admission had been in effect for just three years," so "further factfinding" "might yield little insight." Ante, at 2209. This reasoning is dangerously incorrect. The Equal Protection Clause does not provide a 3-year grace period for racial discrimination. Under strict scrutiny, UT was required to identify evidence that race-based admissions were necessary to achieve a compelling interest before it put them in place-not three or more years after. See ante, at 2211 ("Petitioner is correct that a university bears a heavy burden in showing that it had not obtained the educational benefits of diversity before it turned to a race-conscious plan" (emphasis added)); Fisher I, 570 U.S., at ----, 133 S.Ct., at 2420 ("[S]trict scrutiny imposes on the university the ultimate burden of demonstrating, before turning to racial classifications, that available, workable race-neutral alternatives do not suffice" (emphasis added)). UT's failure to obtain actual evidence that racial preferences were necessary before resolving to use them only confirms that its decision to inject race into admissions was a reflexive response to Grutter,[16] and that UT did not seriously consider whether race-neutral means would serve its goals as well as a race-based process.
B
Second, in an effort to excuse UT's lack of evidence, the Court argues that because "the University lacks any authority to alter the role of the Top Ten Percent Plan," "it similarly had no reason to keep extensive data on the Plan or the students admitted under it-particularly in the years before Fisher I clarified the stringency of the strict-scrutiny burden for a school that employs race-conscious review." Ante, at 2209. But UT has long been aware that it bears the burden of justifying its racial discrimination under strict scrutiny. See, e.g., Brief for Respondents in No. 11-345, at 22 ("It is undisputed that UT's consideration of race in its holistic admissions process triggers strict scrutiny," and "that inquiry is undeniably rigorous").[17] In light of this burden, UT had every reason to keep data on the students admitted through the Top Ten Percent Plan. Without such data, how could UT have possibly identified any characteristics that were lacking in Top Ten Percent admittees and that could be obtained via race-conscious *2240 admissions? How could UT determine that employing a race-based process would serve its goals better than, for instance, expanding the Top Ten Percent Plan? UT could not possibly make such determinations without studying the students admitted under the Top Ten Percent Plan. Its failure to do so demonstrates that UT unthinkingly employed a race-based process without examining whether the use of race was actually necessary. This is not-as the Court claims-a "good-faith effor[t] to comply with the law." Ante, at 2209.
The majority's willingness to cite UT's "good faith" as the basis for excusing its failure to adduce evidence is particularly inappropriate in light of UT's well-documented absence of good faith. Since UT described its admissions policy to this Court in Fisher I, it has been revealed that this description was incomplete. As explained in an independent investigation into UT admissions, UT maintained a clandestine admissions system that evaded public scrutiny until a former admissions officer blew the whistle in 2014. See Kroll, Inc., University of Texas at Austin-Investigation of Admissions Practices and Allegations of Undue Influence 4 (Feb. 6, 2015) (Kroll Report). Under this longstanding, secret process, university officials regularly overrode normal holistic review to allow politically connected individuals-such as donors, alumni, legislators, members of the Board of Regents, and UT officials and faculty-to get family members and other friends admitted to UT, despite having grades and standardized test scores substantially below the median for admitted students. Id., at 12-14; see also Blanchard & Hoppe, Influential Texans Helped Underqualified Students Get Into UT, Dallas Morning News, July 20, 2015, online at http://www.dallasnews.com/news/education/headlines/20150720-influential-texans-helped-underqualified-students-get-into-ut.ece ("Dozens of highly influential Texans-including lawmakers, millionaire donors and university regents-helped underqualified students get into the University of Texas, often by writing to UT officials, records show").
UT officials involved in this covert process intentionally kept few records and destroyed those that did exist. See, e.g., Kroll Report 43 ("Efforts were made to minimize paper trails and written lists during this end-of-cycle process. At one meeting, the administrative assistants tried not keeping any notes, but this proved difficult, so they took notes and later shredded them. One administrative assistant usually brought to these meetings a stack of index cards that were subsequently destroyed"); see also id., at 13 (finding that "written records or notes" of the secret admissions meetings "are not maintained and are typically shredded"). And in the course of this litigation, UT has been less than forthright concerning its treatment of well-connected applicants. Compare, e.g., Tr. of Oral Arg. 51 (Dec. 9, 2015) ("University of Texas does not do legacy, Your Honor"), and App. 281a ("[O]ur legacy policy is such that we don't consider legacy"), with Kroll Report 29 (discussing evidence that "alumni/legacy influence" "results each year in certain applicants receiving a competitive boost or special consideration in the admissions process," and noting that this is "an aspect of the admissions process that does not appear in the public representations of UT-Austin's admissions process"). Despite UT's apparent readiness to mislead the public and the Court, the majority is "willing to be satisfied by [UT's] profession of its own good faith." Grutter, 539 U.S., at 394, 123 S.Ct. 2325 (KENNEDY, J., dissenting).[18]
*2241 Notwithstanding the majority's claims to the contrary, UT should have access to plenty of information about "how students admitted solely based on their class rank differ in their contribution to diversity from students admitted through holistic review." Ante, at 2209. UT undoubtedly knows which students were admitted through the Top Ten Percent Plan and which were admitted through holistic review. See, e.g., Supp. App. 157a. And it undoubtedly has a record of all of the classes in which these students enrolled. See, e.g., UT, Office of the Registrar, Transcript-Official, online at https://registrar.utexas.edu/students/transcripts-official (instructing graduates on how to obtain a transcript listing a "comprehensive record" of classes taken). UT could use this information to demonstrate whether the Top Ten Percent minority admittees were more or less likely than the holistic minority admittees to choose to enroll in the courses lacking diversity.
In addition, UT assigns PAI scores to all students-including those admitted through the Top Ten Percent Plan-for purposes of admission to individual majors. Accordingly, all students must submit a full application containing essays, letters of recommendation, a resume, a list of courses taken in high school, and a description of any extracurricular activities, leadership experience, or special circumstances. See App. 212a-214a; 235a-236a; 758 F.3d, at 669, n. 14 (Garza, J., dissenting). Unless UT has destroyed these files,[19] it could use them to compare the unique personal characteristics of Top Ten *2242 minority admittees with those of holistic minority admittees, and to determine whether the Top Ten admittees are, in fact, less desirable than the holistic admittees. This may require UT to expend some resources, but that is an appropriate burden in light of the strict scrutiny standard and the fact that all of the relevant information is in UT's possession. The cost of factfinding is a strange basis for awarding a victory to UT, which has a huge budget, and a loss to petitioner, who does not.
Finally, while I agree with the majority and the Fifth Circuit that Fisher I significantly changed the governing law by clarifying the stringency of the strict scrutiny standard,[20] that does not excuse UT from meeting that heavy burden. In Adarand, for instance, another case in which the Court clarified the rigor of the strict scrutiny standard, the Court acknowledged that its decision "alter[ed] the playing field in some important respects." 515 U.S., at 237, 115 S.Ct. 2097. As a result, it "remand[ed] the case to the lower courts for further consideration in light of the principles [it had] announced ." Ibid. (emphasis added). In other words, the Court made clear that-notwithstanding the shift in the law-the government had to meet the clarified burden it was announcing. The Court did not embrace the notion that its decision to alter the stringency of the strict scrutiny standard somehow allowed the government to automatically prevail.
C
Third, the majority notes that this litigation has persisted for many years, that petitioner has already graduated from another college, that UT's policy may have changed over time, and that this case may offer little prospective guidance. At most, these considerations counsel in favor of dismissing this case as improvidently granted. But see, e.g., Gratz, 539 U.S., at 251, and n. 1, 260-262, 123 S.Ct. 2411 (rejecting the dissent's argument that, because the case had already persisted long enough for the petitioners to graduate from other schools, the case should be dismissed); id., at 282, 123 S.Ct. 2411 (Stevens, J., dissenting). None of these considerations has any bearing whatsoever on the merits of this suit. The majority cannot side with UT simply because it is tired of this case.
IV
It is important to understand what is and what is not at stake in this case. What is not at stake is whether UT or any other university may adopt an admissions plan that results in a student body with a broad representation of students from all racial and ethnic groups. UT previously had a race-neutral plan that it claimed had "effectively compensated for the loss of affirmative action," App. 396a, and UT could have taken other steps that would have increased the diversity of its admitted students without taking race or ethnic background into account.
What is at stake is whether university administrators may justify systematic racial discrimination simply by asserting that such discrimination is necessary to achieve "the educational benefits of diversity," without explaining-much less proving-why the discrimination is needed or how *2243 the discriminatory plan is well crafted to serve its objectives. Even though UT has never provided any coherent explanation for its asserted need to discriminate on the basis of race, and even though UT's position relies on a series of unsupported and noxious racial assumptions, the majority concludes that UT has met its heavy burden. This conclusion is remarkable-and remarkably wrong.
Because UT has failed to satisfy strict scrutiny, I respectfully dissent.

See also Nissimov, UT To Resume Factoring in Applicants' Race: UT To Reintroduce Race-Based Criteria, Houston Chronicle, June 24, 2003, p. 4A ("President Larry Faulkner said Monday his institution will quickly develop race-based admissions criteria by the fall that would be used for the summer and fall of 2004, after being given the green light to do so by Monday's U.S. Supreme Court ruling"); Silverstein, Hong, & Trounson, State Finds Itself Hemmed In, L.A. Times, June 24, 2003, p. A1 (explaining UT's "intention, after dropping race as a consideration, to move swiftly to restore its use in admissions" in time for "the next admissions cycle"); Hart, Texas Ponders Changes to 10% Law, Boston Globe, June 25, 2003, p. A3 ("Soon after Monday's ruling, University of Texas President Larry Faulkner said that the school will overhaul procedures" in order to allow consideration of "[t]he race of an applicant" for "students enrolling in fall 2004"); Ambiguity Remains; High Court Leaves Quota Questions Looming, El Paso Times, June 25, 2003, p. 6B ("The University of Texas at Austin's president, Larry Faulkner, has already announced that new admissions policies would be drafted to include race as a factor").

In 2010, 3.8% of Texas's population was Asian, but 18.6% of UT's enrolled, first-time freshmen in 2008 were Asian-American. See Supp. App. 156a; United States Census Bureau, QuickFacts (QuickFacts Texas), online at https://www.census.gov/quickfacts/table/PST045215/48. By contrast, 37.6% of Texas's 2010 population identified as Hispanic or Latino, but a lower percentage-19.9%-of UT's enrolled, first-time freshmen in 2008 were Hispanic. See Supp. App. 156a; QuickFacts Texas.

If UT's goal is to have at least two African-Americans, two Hispanics, and two Asian-Americans present in each of the relevant classrooms, that goal is literally unreachable in classes of five and practically unreachable in many other small classes.

The majority's assertion that UT's race-based policy does not discriminate against Asian-American students, see ante, at 2206 - 2207, defies the laws of mathematics. UT's program is clearly designed to increase the number of African-American and Hispanic students by giving them an admissions boost vis-à-vis other applicants. See, e.g., Supp. App. 25a; App. 445a-446a; cf. 645 F.Supp.2d 587, 606 (W.D.Tex.2009) ; see also ante, at 2223 (citing increases in the presence of African-Americans and Hispanics at UT as evidence that its race-based program was successful). Given a "limited number of spaces," App. 250a, providing a boost to African-Americans and Hispanics inevitably harms students who do not receive the same boost by decreasing their odds of admission.

In particular, the Fifth Circuit's willful blindness to Asian-American students is absolutely shameless. For instance, one of the Fifth Circuit's primary contentions-which UT repeatedly highlighted in its brief and at argument-is that, given the SAT score gaps between whites on the one hand and African-Americans and Hispanics on the other, "holistic admissions would approach an all-white enterprise" in the absence of racial preferences. 758 F.3d, at 647. In making this argument, the court below failed to mention Asian-Americans. The reason for this omission is obvious: As indicated in the very sources that the Fifth Circuit relied on for this point, on the very pages it cited, Asian-American enrollees admitted to UT through holistic review have consistently higher average SAT scores than white enrollees admitted through holistic review. See UT, Office of Admissions, Implementation and Results of the Texas Automatic Admissions Law (HB 588) at the University of Texas at Austin, Demographic Analysis of Entering Freshmen Fall of 2006, pp. 11-14 (rev. Dec. 6, 2007), cited at 758 F.3d, at 647, n. 71 ; UT, Office of Admissions, Implementation and Results of the Texas Automatic Admissions Law (HB 588) at the University of Texas at Austin, Demographic Analysis of Entering Freshmen Fall of 2008, pp. 12-15 (Oct. 28, 2008), cited at 758 F.3d, at 647, n. 72. The Fifth Circuit's intentional omission of Asian-Americans from its analysis is also evident in the appendices to its opinion, which either omit any reference to Asian-Americans or misleadingly label them as "other." See id., at 661. The reality of how UT treats Asian-American applicants apparently does not fit into the neat story the Fifth Circuit wanted to tell.

And it is anybody's guess whether this group also includes applicants "of full or partial Arab, Armenian, Azerbaijani, Georgian, Kurdish, Persian, or Turkish descent, or whether such applicants are to be considered 'White.' " Brief for Judicial Watch, Inc., et al. as Amici Curiae 16.

United States Census Bureau, 2010 Census Shows Multiple-Race Population Grew Faster Than Single-Race Population (Sept. 27, 2012), online at https://www.census.gov/newsroom/releases/archives/race/cb12-182.html.

W. Wang, Pew Research Center, Interracial Marriage: Who Is "Marrying Out"? (June 12, 2015), online at http://www.pewresearch.org/fact-tank/2015/06/12/interracial-marriage-who-is-marrying-out/; W. Wang, Pew Research Center, The Rise of Intermarriage (Feb. 16, 2012), online at http://www.pewsocialtrends.org/2012/02/16/the-rise-of-intermarriage/.

Amici supporting UT certainly understood it to be arguing that it needs affirmative action to admit privileged minorities. See Brief for Six Educational Nonprofit Organizations 38 (citing Brief for Respondents in No. 11-345, p. 34). And UT's amici continue to press the full-throated version of the argument. See Brief for Six Educational Nonprofit Organizations 12-13 ("Intraracial diversity ... explodes perceived associations between racial groups and particular demographic characteristics, such as the 'common stereotype of Black and Latina/o students[ ] that all students from these groups come from poor, inner-city backgrounds.' Schools like UT combat such stereotypes by seeking to admit African-American and Latino students from elevated socioeconomic and/or non-urban backgrounds" (citation omitted)); id., at 15 (arguing that UT needs racial preferences to admit minority students from "elevated" "socioeconomic backgrounds," because "such students are on a more equal social footing with the average nonminority student"); id., at 37-38 ("African-American and Latino students who may come from higher socioeconomic status ... may serve as 'debiasing agent[s],' promoting disequilibrium to disrupt stereotypical associations. These students are also likely to be better able to promote communication and integration on campus" (citation omitted)).

See, e.g., Strauss, Study: High School Grades Best Predictor of College Success-Not SAT/ACT Scores, Washington Post, Feb. 21, 2014, online at https://www.washingtonpost.com/news/answer-sheet/wp/2014/02/21/a-telling-study-about-act-sat-scores/.

See, e.g., Freedle, Correcting the SAT's Ethnic and Social-Class Bias: A Method for Reestimating SAT Scores, 73 Harv. Ed. Rev. 1 (2003) ("The SAT has been shown to be both culturally and statistically biased against African Americans, Hispanic Americans, and Asian Americans"); Santelices & Wilson, Unfair Treatment? The Case of Freedle, the SAT, and the Standardization Approach to Differential Item Functioning, 80 Harv. Ed. Rev. 106, 127 (2010) (questioning the validity of African-American SAT scores and, consequently, admissions decisions based on those scores); Brief for Amherst University et al. as Amici Curiae 15-16 ("[E]xperience has taught amici that SAT and ACT scores for African-American students do not accurately predict achievement later in college and beyond"); Brief for Experimental Psychologists as Amici Curiae 7 ("A substantial body of research by social scientists has revealed that standardized test scores and grades often underestimate the true academic capacity of members of certain minority groups"); Brief for Six Educational Nonprofit Organizations as Amici Curiae 21 ("Underrepresentation of African-American and Latino students by conventional academic metrics was also a reflection of the racial bias in standardized testing").

Zumbrun, SAT Scores and Income Inequality: How Wealthier Kids Rank Higher, Wall Street Journal, Oct. 7, 2014, online at http://blogs.wsj.com/economics/2014/10/07/sat-scores-and-income-inequality-how-wealthier-kids-rank-higher/.

See e.g., Brief for California Institute of Technology et al. as Amici Curiae 15 ("[I]n amicus George Washington University's experience, standardized test scores are considered so limited in what they can reveal about an applicant that the University recently has done away with the requirement altogether"); see also American University, Applying Test Optional, online at http://www.american.edu/admissions/testoptional.cfm; The University of Arizona, Office of Admissions, Frequently Asked Questions, online at https://admissions.arizona.edu/freshmen/frequently-asked-questions; Bowdoin College, Test Optional Policy, online at http://www.bowdoin.edu/admissions/apply/testing-policy.shtml; Brandeis University, Test-Optional Policy, online at http://www.brandeis.edu/admissions/apply/testing.html; Bryn Mawr College, Standardized Testing Policy, online at http://www.brynmawr.edu/admissions/standardized-testing-policy; College of the Holy Cross, What We Look For, online at http://www.holycross.edu/admissions-aid/what-we-look-for; George Washington University, Test-Optional Policy, online at https://undergraduate.admissions.gwu.edu/test-optional-policy; New York University, Standardized Tests, online at http://www.nyu.edu/admissions/undergraduate-admissions/how-to-apply/all-freshmen-applicants/instructions/standardized-tests.html; Smith College, For First-Year Students, online at http://www.smith.edu/admission/firstyear_apply.php; Temple University, Temple Option FAQ, online at http://admissions.temple.edu/node/441; Wake Forest University, Test Optional, online at http://admissions.wfu.edu/apply/test-optional/.
In 2008, Wake Forest dropped standardized testing requirements based at least in part on "the perception that these tests are unfair to blacks and other minorities and do not offer an effective tool to determine if these minority students will succeed in college." Wake Forest Presents the Most Serious Threat So Far to the Future of the SAT, The Journal of Blacks in Higher Education, No. 60 (Summer 2008), p. 9; see also ibid. ("University admissions officials say that one reason for dropping the SAT is to encourage more black and minority applicants"). "The year after the new policy was announced, Wake Forest's minority applications went up by 70%, and the first test-optional class" exhibited "a big leap forward" in minority enrollment. J. Soares, SAT Wars: The Case for Test-Optional College Admissions 3 (2012). From 2008 to 2015, "[e]thnic diversity in the undergraduate population increased by 54 percent." Wake Forest University, Test Optional, online at http://admissions.wfu.edu/apply/test-optional/. And Wake Forest reports that dropping standardized testing requirements has "not compromise[d] the academic quality of [the] institution," and that it has made the university "more diverse and intellectually stimulating." Ibid.

The Court asserts that race-blind, holistic review is not a workable alternative because UT tried, and failed, to meet its goals via that method from 1996 to 2003. See ante, at 2213 ("Perhaps more significantly, in the wake of Hopwood, the University spent seven years attempting to achieve its compelling interest using race-neutral holistic review"). But the Court never explains its basis for concluding that UT's previous system failed. We are not told how the Court is measuring success or how it knows that a race-conscious program will satisfy UT's goals more effectively than race-neutral, holistic review. And although the majority elsewhere emphasizes "the University's continuing obligation to satisfy the burden of strict scrutiny in light of changing circumstances," ante, at 2203, its rejection of race-blind, holistic review relies exclusively on "evidence" predating petitioner's suit by five years.

In 2008, 1,208 first-time freshmen from Texas high schools enrolled at UT after being admitted outside the Top Ten Percent Plan. Supp. App. 157a. Based on the 2004 statistics, it is reasonable to assume that, if the University had undertaken a race-neutral holistic review in 2008, 3.6% (43) of these students would have been African-American and 11.6% (140) would have been Hispanic. See ibid. Under the University's race-conscious holistic review, 58 African-American freshmen from Texas and 158 Hispanic freshmen from Texas were enrolled in 2008, thus reflecting an increase of only 15 African-American students and 18 Hispanic students. And if those marginal increases (of 15 and 18 students) are divided by the number of total enrolled first-time freshmen from Texas high schools (6,322), see ibid., the calculation yields the 0.2% and 0.3% percentages mentioned in the text above.

Recall that UT's president vowed to reinstate race-conscious admissions within hours of Grutter 's release. See Part I, supra .

See also, e.g., Parents Involved in Community Schools v. Seattle School Dist. No. 1, 551 U.S. 701, 720, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007) ("It is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny"); Grutter v. Bollinger, 539 U.S. 306, 326, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) ("We have held that all racial classifications imposed by government 'must be analyzed by a reviewing court under strict scrutiny' "); Gratz v. Bollinger, 539 U.S. 244, 270, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003) ("It is by now well established that 'all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized' "); Adarand Constructors, Inc. v. Peã, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) ("[W]e hold today that all racial classifications, imposed by whatever federal, state, or local government actor, must be analyzed by a reviewing court under strict scrutiny").

The majority's claim that UT has not "had a full opportunity to respond to" the Kroll Report, ante, at 2212, is simply wrong. The report was discussed in no less than six of the briefs filed in this case. See Brief in Opposition 19-20, n. 2; Reply to Brief in Opposition 6; Brief for Respondents 51, n. 9; Brief for Cato Institute as Amicus Curiae 8-12 (certiorari stage); Brief for Cato Institute as Amicus Curiae 12, and n. 4 (merits stage); Brief for Judicial Education Project as Amicus Curiae 5-17. Not only did UT have an "opportunity to respond" to the Kroll Report-it did in fact respond at both the certiorari stage and the merits stage. See Brief in Opposition 19-20, n. 2 (explicitly discussing the "recently released Kroll Report"); Brief for Respondents 51, n. 9 (similar). And the Court's purported concern about reliance on "extrarecord materials," ante, at 2211, rings especially hollow in light of its willingness to affirm the decision below, which relied heavily on the Fifth Circuit's own extrarecord Internet research, see, e.g., 758 F.3d, at 650-653.
The majority is also wrong in claiming that the Kroll Report is "tangential to this case at best." Ante, at 2212. Given the majority's blind deference to the good faith of UT officials, evidence that those officials "failed to speak with the candor and forthrightness expected of people in their respective positions of trust and leadership," Kroll, Inc., University of Texas at Austin-Investigation of Admissions Practices and Allegations of Undue Influence 29 (Feb. 6, 2015), when discussing UT's admissions process is highly relevant.

UT's current records retention policy requires it to retain student records, including application materials, for at least five years after a student graduates. See University of Texas at Austin, Records Retention Schedule, Agency Item No. AALL358, p. 58 (Nov. 14, 2014), online at https://www.tsl.texas.gov/sites/default/files/public/tslac/slrm/state/schedules/721.pdf. If this policy was in place when UT resumed race-conscious admissions in 2004, then it still had these materials when petitioner filed this suit in 2008, and likely still had them at the time of Fisher I in 2013. At the very least, the application materials for the 2008 freshman class appear to be subject to a litigation hold. See App. 290a-292a. To the extent that UT failed to preserve these records, the consequences of that decision should fall on the University, not on petitioner. Cf. Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. ----, ----, 136 S.Ct. 1036, 1047, 194 L.Ed.2d 124 (2016) (allowing "a representative sample to fill an evidentiary gap created by the employer's failure to keep adequate records").

See ante, at 2209 ("Fisher I clarified the stringency of the strict-scrutiny burden for a school that employs race-conscious review"); 758 F.3d, at 642 ("Bringing forward Justice Kennedy's dissent in Grutter, the Supreme Court faulted the district court's and this Court's review of UT Austin's means to achieve the permissible goal of diversity"); id., at 665, n. 5 (Garza, J., dissenting) ("I agree with the majority that Fisher represents a decisive shift in the law").